# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| STEVEN LUGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:13-CV-203 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff, Steven Lugo. For the reasons set forth below, the Commissioner of Social Security's final decision is **AFFIRMED.**

BACKGROUND

On April 19, 2010, Plaintiff, Steven J. Lugo ("Lugo"), applied for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. section 401 *et seq*. Lugo alleged his disability began on June 12, 2009. The Social Security Administration denied his initial application and also denied his claims on reconsideration. On August 8, 2011, Lugo appeared with his attorney and testified at an administrative hearing before Administrative Law Judge ("ALJ") Dennis R. Kramer ("Kramer"). In

addition, Dr. James M. McKenna, M.D., testified as a medical expert ("ME") and Leonard M. Fisher testified as a vocational expert ("VE"). Additional medical evidence was submitted necessitating a supplemental hearing. The supplemental hearing was held on January 3, 2012. At this hearing, Lugo testified in addition to James M. Brooks, Ph.D., an ME, and Thomas A. Gusloff, a VE. On January 11, 2012, ALJ Kramer denied Lugo's DIB claim, finding that Lugo had not been under a disability as defined in the Social Security Act.

Lugo requested that the Appeals Council review the ALJ's decision. This request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a)(2005). Lugo has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. section 405(g).

DISCUSSION

Facts

Lugo was born on January 26, 1967, and was 42 years old on the alleged disability onset date. (Tr. 23, 209). Lugo's alleged impairments include hypertension, status-post left shoulder rotator cuff surgery with detached bicep surgery on the left arm, cubital tunnel syndrome, and depression. (Tr. 13-14). He has a high school diploma and completed a 5-year apprenticeship. (Tr. 227). His only past relevant work is as a journeyman sheet-metal worker. (Tr. 228).

He last worked in June of 2009. (Tr. 228).

The medical evidence can be summarized as follows:

Lugo injured his rotator cuff and biceps tendon on February 5, 2009, while drilling and reaching overhead at work. (Tr. 322). He participated in physical therapy for about three weeks with no improvement. (Tr. 322, 388).

An MRI of Lugo's left shoulder taken on April 7, 2009, showed findings suggestive of a rotator cuff tear and productive changes at the acromioclavicular joint, with some impingement. (Tr. 315-16, 341, 368, 394, 492).

On June 18, 2009, Lugo underwent surgery performed by Dr. Thometz at the Same Day Surgery Center at Ingalls Family Care Center. (Tr. 322, 372). The procedures performed were: left shoulder arthroscopic rotator cuff repair with subacromial decompression and arthroscopic biceps tenodesis. (Tr. 375, 396, 520). On June 29, 2009, it was noted that his wounds were clean and he could start therapy. (Tr. 387). On August 18, 2009, Lugo's physical therapist recommended that he continue with therapy. (Tr. 360). Physical therapy notes from September 1, 2009, show Lugo putting forth maximum effort but still having difficulty using his left arm against gravity. (Tr. 358). On September 9, 2009, Dr. Thometz noted that Lugo still had some soreness and difficulty sleeping but the physical therapy was helping. (Tr. 385). September 17, 2009, notes from Accelerated Rehabilitation Center show that Lugo was continuing to benefit from physical therapy.

(Tr. 347-48, 350, 356, 503). On October 7, 2009, Dr. Thometz reported that Lugo was having a bit of weakness for finger abduction and had a little bit of sensitivity for Tinel's at the elbow. (Tr. 385). He was making slow progress in physical therapy but therapy was continued. (*Id.*).

An October 20, 2009, MRI of Lugo's left shoulder showed: reduced sensitivity/specificity for pathology due to patient motion; intact attenuated supraspinatus rotator cuff repair with intrinsic signal abnormality which likely is post-surgical; intact biceps anchor and long head of the biceps tendon with intrinsic signal abnormality which likely is post-surgical; and severe infraspinatous tendinosis along with a small partial thickness articular surface subscapularis tear. (Tr. 339-40, 392-93, 490-91). On October 23, 2009, Dr. Thometz discussed the MRI results with Lugo and reported that his current therapy would be continued. (Tr. 384, 480).

On November 4, 2009, Lugo underwent an independent medical examination by Dr. Timothy R. Lubenow. (Tr. 322-27). Dr. Lubenow reported:

> He is still having a lot of pain with certain
> motions, especially internal and external
> rotation at the shoulder joint. He also is
> having limitations with movement. He also states
> that he has some numbness and paresthesias in his
> pinky and ring fingers that run up to mid-
> forearm. He describes a constant ache in his
> shoulders of around 5-6/10 and with motion during
> therapy and certain stretches, the pain can get
> to be a 9-10/10. The pain is all in his left
> shoulder and he describes the pain as aching,
> with occasional shooting pains down the arm. He

> feels that he has muscle weakness on that side in
> that upper extremity as well as tremors.

(Tr. 322). His medications in November of 2009 included Norco 10/325[1], which he takes three or four times per day and Ambien CR[2] which he takes at bedtime. (Tr. 322). Lugo was measured at 5'11" with a weight of 240 pounds.[3] (Tr. 322). Dr. Lubenow reported that Lugo had significant tremors both at rest and with active motion. (Tr. 322-23). Grip strength on the left was reduced to 3/5 compared to the right and flexion, extension, abduction and adduction at the left shoulder were all decreased to 4/5. (Tr. 323). Flexion and extension strength at the left elbow was 4/5. (*Id.*). He also had significantly limited range of motion, especially with flexion (approximately 110°/180°) and abduction (approximately 105°/180°). (Tr. 323). Extension was limited to about 35°/60°. In addition, Lugo had paresthesias and sensory changes along the pinky and ring fingers and also in the lateral hand and wrist. (*Id.*). Dr. Lubenow concluded that Lugo's function was severely restricted and recommended that he

---

[1]Norco 10/325 (10 mg of hydrocodone bitartrate and 325 mg of acetaminophen is an opioid analgesic used to treat moderate to moderately severe pain. The most frequent side effects of Norco are lightheadedness, dizziness, sedation, nausea, and vomiting. http://www.rxlist.com/norco-drug.htm

[2] Ambien CR (zolpidem tartrate) is a sedative used to treat insomnia characterized by difficulty falling asleep and/or staying asleep. http://www.rxlist.com/ambien-cr-drug.htm

[3]A height of 5'11" and a weight of 240 pounds indicates a body mass index (BMI) of 33.5 which reflects obesity. http://nhlbisupport.com/bmi/bminojs.htm

continue attending therapy three times per week. (Tr. 323).

On November 9, 2009, Dr. Thometz reported that Plaintiff was making progress in therapy. (Tr. 331). He was still tight for internal rotation and still having some numbness and tingling through the ring and small fingers of his left hand. (*Id.*). He has a fairly weak left grip compared to the right. (*Id.*). On exam he had a mildly positive Tinel's sign at the elbow and at the wrist for the ulnar nerve. (Tr. 331). Dr. Thometz noted that Lugo "is not capable of work. He will continue in his current therapy program." (Tr. 331). Physical therapy notes from November 17, 2009, show Lugo putting forth maximum effort, that he is making some progress and that the skilled therapy should continue. (Tr. 346, 501). On November 18, 2009, Dr. Thometz noted that Lugo was progressing in therapy. (Tr. 384, 480). He still had some numbness and tingling in the left small and ring finger. (Tr. 384, 480). Dr. Thometz continued Lugo in his current therapy. (*Id.*).

On December 3, 2009, George Charuk, M.D., administered an electrodiagnostic study at the referral of Dr. Thometz. (Tr. 328-30, 383, 479). The EMG showed a conduction abnormality of the ulnar nerve distal to the medial epicondyle. "These electrical findings are consistent with a mild cubital tunnel syndrome."[4] (Tr. 330, 332,

_____

[4]"Cubital Tunnel Syndrome is a condition brought on by increased pressure on the ulnar nerve at the elbow.... [S]ymptoms usually include pain, numbness and/or tingling. The numbness and tingling most often occurs in the ring and little fingers.... When symptoms are severe or do not improve, surgery may be needed

336).  On December 10, 2009, Dr. Thometz gave Lugo a prescription to continue his current therapy program, noting that he was not yet ready for work conditioning.  (Tr. 380).

On January 5, 2010, physical therapist Cheryl Shelby reported to Dr. Thometz that Lugo was making slow progress and recommended that another four weeks of therapy (2-3x/week) be prescribed.  (Tr. 344, 362, 495).  On January 19, 2010, Chartis-Clayton (the Worker's Comp insurer) indicated that it was denying coverage for additional therapy claiming that it did not appear to be medically necessary.  (Tr. 363, 496).  On January 27, 2010, Dr. Thometz noted that the prior request for additional therapy had been denied and he wrote a new prescription for therapy.  (Tr. 380).

On February 3, 2010, it was noted that no therapy had been approved and Lugo was still having a lot of difficulty with his wrist. (Tr. 379, 475).  Dr. Thometz reported persistent left wrist pain. (*Id.*).  On February 24, 2010, an MRI of Lugo's left wrist showed non-specific edema over the dorsum of the carpus within the region of the dorsal intercarpal ligaments, suspicious for ligamentous injury; also mild osteoarthritis in the carpus.  (Tr. 338, 391, 489).  On March 3, 2010, Lugo and Dr. Thometz discussed the MRI results and the fact that Lugo has not gotten the approval for any additional therapy or even

---

to ease the pressure on the nerve."   http://www.assh.org/Public/ HandConditions/Pages/CubitalTunnelSyndrome.aspx.   Even after surgery the symptoms may not completely resolve, especially in severe cases. (*Id.*).

any home exercise equipment. (Tr. 376, 472). Dr. Thometz recommended a trial of therapy for the left wrist and resumption of therapy for the shoulder. (*Id.*). He noted that Lugo was "not capable of regular work." (Tr. 378). On April 7, 2010, Dr. Thometz noted that Lugo still had numbness through the ring and small fingers and soreness through the wrist. (Tr. 376, 472). Although there was almost full forward elevation there was still some tightness for internal rotation with the thumb getting a little bit past the hip towards L4. (*Id.*). Dr. Thometz still recommended a course of therapy for the wrist and elbow and additional therapy for the shoulder. (Tr. 376, 472). Dr. Thomas also reported that Lugo was "not capable of regular work at that time." (Tr. 376, 472). On May 5, 2010, Dr. Thometz reported no change in Lugo's condition or his recommendations. (Tr. 468).

On June 11, 2010, Lugo was examined by Kanayo K. Odeluga, M.D., at the request of the SSA. (Tr. 416-19). Lugo related left shoulder pain that he described as aching, constant and moderate in intensity. (Tr. 416). It was noted that after the surgery Lugo returned to physical therapy until January of 2010, when the Worker's Compensation insurer did not approve further therapy. (*Id.*). Lugo reported that heavy lifting and overhead motion exacerbated his pain. (Tr. 416). He also has pain in his left wrist. (*Id.*). An MRI of the wrist showed a lot of inflammation. (Tr. 416). His medication still included Norco and Ambien. (*Id.*). Dr. Odeluga noted that Lugo had numbness over the fourth and fifth fingers of his left hand and he was

diagnosed with ulnar neuropathy following EMG and a nerve conduction study. (Tr. 417). There was a positive Tinel sign over the ulna groove on the medial aspect of the left elbow. (Tr. 418). Neurological exam was normal. (Tr. 419). Dr. Odeluga's impression was: chronic left shoulder pain, left shoulder rotator cuff/biceps tendon tear post-repair, left ulnar neuropathy, hypertension, hypercholesterolemia and obesity. (Tr. 419).

On June 23, 2010, Lugo was examined by psychologist Irena M. Walters, Psy.D., at the request of the SSA. (Tr. 427-29). Lugo related to Dr. Walters that he had not had any physical therapy since January after Worker's Compensation told him he was not entitled to any more therapy. (Tr. 427). Lugo related that he was left-handed and had lost mobility in his left hand. (Tr. 428). Lugo admitted to feelings of hopelessness or helplessness since being out of work. (Tr. 428). Since the injury he has experienced fatigue, loss of energy and a loss of interest in doing things. (Tr. 428). Dr. Walters found that Lugo's mood was subdued and his affect was appropriate. (Tr. 428). Dr. Walters noted that Lugo put forth good effort during the evaluation. (Tr. 429). Dr. Walters gave no diagnosis on Axis I or Axis II. (Tr. 429).

On June 30, 2010, Amy Johnson, Ph.D., reviewed the records and filled out a psychiatric review technique form indicating that Lugo

had no medically determinable mental impairment.[5] (Tr. 430). On July 9, 2010, Fernando Montoya, M.D., reviewed the record and filled out a physical residual functional capacity form opining that Lugo retained the functional capacity for light work with occasional climbing of ladders, ropes and scaffolds and also occasional crawling; but with frequent climbing of ramps/stairs, balancing stooping, kneeling and crouching.[6] (Tr. 444-52). Dr. Montoya concluded that reaching and handling should be limited to occasional with the left arm and that there were not limitations in reaching or handling with the right arm. (Tr. 447). Dr. Montoya further concluded that Lugo had no limitations with regard to fingering or feeling with either hand. (*Id.*).

On July 7, 2010, Dr. Thometz noted that authorization had not been granted for Lugo to see the hand specialist. (Tr. 468). On August 11, 2010, Dr. Thometz reported no change although Lugo reported feeling anxious and depressed. (Tr. 455, 466). Dr. Thometz recommended that Lugo have a psychological evaluation. (*Id.*). Dr. Thometz continued to report no change in Lugo's condition from September 2010 through December 2010. (Tr. 455, 465, 466).

_____

[5]On October 12, 2010, another State agency physician, J. Grange, Ph.D., affirmed Dr. Johnson's form as written. (Tr. 452).

[6]It appears that, on October 7, 2010, Dr. Montoya's RFC form was affirmed as written by B. Whitley, M.D., another State agency paper reviewer. (Tr. 458). Dr. Whitley references an assessment dated July 12, 2010, not July 9, 2010, but this Court did not find any report in the file dated July 9, 2010.

An MRI arthrogram of Lugo's left shoulder taken on January 17, 2011, showed status-post rotator cuff repair, mild subacromial bursitis and degenerative changes of the acromioclavicular articulation. (Tr. 487).

On April 20, 2011, Dr. Thometz reported that Lugo had seen Dr. Nagel and that Dr. Nagel thought that the cubital tunnel syndrome was likely an aggravation of his post-surgical treatment. (Tr. 462). On May 18, 2011, Dr. Thometz reported that a new EMG[7] showed evidence of bilateral cubital tunnel syndrome. (Tr. 459, 542). Lugo continued to have numbness and tingling in his left hand but no symptoms on the right. (*Id.*). On exam he had a positive Tinel's sign at the elbow. (*Id.*). He also had some difficulty with weakness of small finger abduction. (*Id.*).

On June 15, 2011, Dr. Thometz reported that Lugo's condition was basically unchanged. (Tr. 459, 542). On July 27, 2011, Dr. Thometz reported no change and that the worker's comp insurer had still not approved any additional treatment. (Tr. 542). Lugo was still having numbness and tingling through his small and ring fingers on his left hand and he had been getting some popping and discomfort while trying to do home exercises. (Tr. 542). Dr. Thometz recommended treating the cubital tunnel and then re-establishing therapy. (*Id.*).

On August 25, 2011, Lugo was examined by Mark A. Amdur, M.D., at the request of Lugo's attorney. (Tr. 551-54). Dr. Amdur is certified

---

[7]The EMG was performed on May 12, 2011. (Tr. 460).

in psychiatry and qualified in forensic psychiatry by the American Board of Psychiatry and Neurology. (Tr. 547). Dr. Amdur reviewed various medical records including the reports of Drs. Parks and Walters from 2008 and 2010. (Tr. 551). Lugo related to Dr. Amdur that he had surgery on his shoulder but his treatment was cut short. (*Id.*). "Feelings of despondency and rejection centered on the denial of physical therapy services,"[8] were a recurring theme throughout the interview. (Tr. 551). Lugo related pain and weakness in his left shoulder with numbness and tingling in his left hand that interferes with gripping and grasping. (Tr. 551). He also related problems with focus and following through with directions. (*Id.*). Lugo admitted to crying daily over the last six months. (Tr. 551). Lugo described diminished libido and diminished desire to play with his children. (*Id.*). He had withdrawn from family contact. (*Id.*). He tearfully admitted to often wishing he was dead. (*Id.*). He had also reportedly gained weight. (Tr. 552). He related marked difficulty staying asleep. (Tr. 554). Lugo said he had given up going to church. (Tr. 552). He mostly just lies around the house and has to be prompted to shower, shave or change clothes. (Tr. 552).

Brief muscle testing revealed diminished strength in his left shoulder and left hand. He seemed unable to move the third and fourth fingers of his left hand. He is obese. (Tr. 552). Dr. Amdur

---

[8]The physical therapy services were denied by the Worker's Compensation insurer for the first time in January 2010, but the refusal to authorize or pay for treatment continued.

reported that Lugo was tense and apprehensive to a moderately severe degree. (*Id.*). Lugo's responses were moderately slowed. (*Id.*). "Affect was depressed to a moderately severe degree." (Tr. 552). Dr. Amdur noted that Lugo is obsessive and fixated on the physical therapy services and treatment denied to him. His somatic and pain preoccupations are markedly severe. (Tr. 552). Lugo was unable to name any recent news events. (*Id.*). His score on the Montreal Cognitive Assessment showed a mild cognitive impairment. (*Id.*). His performance on that test was slow. (Tr. 552). Dr. Amdur reported that, "the intensity and persistence of his current depression are consistent with major depressive disorder." (Tr. 553). Dr. Amdur assessed that Lugo would be a slow worker and unable to relate effectively with co-workers or supervisors. In addition, he believed Lugo was affectively labile and would be unable to tolerate work stresses. (Tr. 553). Dr. Amdur diagnosed Lugo with depression. (*Id.*).

On September 9, 2011, Dr. Amdur completed a medical source statement of ability to do mental activities. (Tr. 544-46). Dr. Amdur reported that because of motor slowing, impaired concentration and diminished ability to tolerate stress, Lugo would be unable to remember, understand and carry out instructions for even unskilled work. (Tr. 544). Marked social withdrawal would limit his capacity to deal with co-workers and supervisors. (Tr. 545).

On September 21, 2011, Dr. Thometz completed a Medical Source

-13-

Statement of ability to do physical work-related activities. (Tr. 555-60). Dr. Thometz reported that Lugo should not be lifting or carrying even as little as ten pounds, and he has bilateral cubital tunnel syndrome in his wrists. (Tr. 555). Ulnar neuropathy has been diagnosed in his left hand and wrist and his shoulder suffers from subluxation/rotator cuff syndrome. (*Id.*). Lugo also has biceps tendonitis. (Tr. 555). Dr. Thometz wrote that Lugo should not do prolonged sitting, standing or walking and that he should not be using his hands or wrists. (Tr. 556). Dr. Thometz reported that Lugo should never use his left hand and his right hand should only be used occasionally for feeling and fingering. (Tr. 557). Dr. Thometz explained that Lugo has generalized weakness bilaterally in his hands and fingers and that the left side is impacted by the ruptured left rotator cuff, left shoulder weakness with limited arm motion and numbness/weakness in the left arm and hand. (Tr. 557). Because of limited upper extremity strength, Dr. Thometz reported that Lugo should never climb ladders, ropes, or scaffolds; stoop, kneel, crouch or crawl; and should only occasionally balance. (Tr. 558).


Lugo's Testimony

At the first hearing before ALJ Kramer on August 2, 2011, Lugo testified that he is left-handed. (Tr. 54). He has a high school education and had been a journeyman sheet-metal worker for over 15 years. (Tr. 54). Lugo explained that there were lapses in his

medical treatment because the worker's compensation insurer has refused to authorize or pay for much of his recommended treatment. (Tr. 56). Lugo testified:

> Well, with - - I constantly get numbness in my hand, my ring finger and my pinky finger. With that, it's hard to grasp things and control things when I have to hold them, you know. I have problems sleeping at night so I - -
>
> * * *
>
> It's because of the pain. I'm constantly turning and so I constantly feel that effect in my left shoulder. And, you know, it's like an aching pain all the time so I'm just trying to deal with it the best I can.

(Tr. 57). He testified that he has a hard time holding on to dishes, but he sets them down before he can drop them. (Tr. 58). He did not think he would be able to sort and handle papers in a file with his left hand. (Tr. 59). He gets numbness if he holds something or if his left arm is in a bent position. (Tr. 60). With his left forearm and hand horizontal he will get numbness in his hand and in the pinky and ring finger. (Tr. 61). Lugo explained that he did not receive all of the post-surgery therapy that he needed so that now just trying to open a door or lifting a negligible weight results in pain. (Tr. 62). According to Lugo, just lifting the arm itself produces pain. (*Id.*).

Lugo explained that the worker's compensation insurer would not authorize or pay for physical therapy beyond January 5, 2010. (Tr. 64). He rated his left shoulder pain at a 6 out of 10, but when tossing and turning at night it goes up to 9 out of 10. (Tr. 64).

The doctor told him to avoid any overhead work. (Tr. 65). Lugo rated the pain in his left bicep area at 5 out of 10. (Tr. 66). He testified that often, if he has not slept well at night, he will get up in the morning, have something to eat and then go lie down, watch some television and possibly fall asleep. (Tr. 66-67). He reports that he rests a couple hours a day. (Tr. 66-67). The day before the hearing he rested for about two hours. (Tr. 67). During the remainder of the day he may go outside and take a little walk because he gets depressed sitting inside all the time. (Tr. 67). One of his doctors recommended that he see a psychiatrist but the insurer would not cover it so he is not receiving treatment for his depression. (Tr. 67). Lugo wants to have additional surgery and additional physical therapy. (Tr. 71).

When asked to describe his depression, Lugo explained, "I don't feel like a person. I don't feel like a man." (Tr. 72). When the pain is bad it makes him angry. If he is doing something when the pain gets bad he usually stops what he is doing. (Tr. 72).

At Lugo's second hearing before ALJ Kramer, on January 3, 2012, Lugo testified that he was still being treated by Dr. Thometz, that he was still taking medication and that ulnar nerve surgery has been discussed. (Tr. 34). He testified that he was still experiencing significant pain. (Tr. 34-35). He also continued to feel depressed. (Tr. 35). In August 2011, Lugo told the doctor that he did not go out very much and spent most of his time at home. Lugo testified that,

-16-

as of the second hearing, that remained true.  (Tr. 35).  Since he
last appeared before the ALJ he feels more down on himself.  (*Id.*).
He stated that he felt he was inadequate for his family.  (*Id.*).  Lugo
was still pretty apathetic, not seeing his friends, not going out and
not wanting to be with people.  (Tr. 35).  He testified that he tends
to stay home, not doing much of anything and not having an interest
in anything.  (Tr. 35-36).  He still has problems sleeping but may
still spend 12 hours a day in bed.  (Tr. 36).  His wife still has to
urge him to get up, shower, shave and change his clothes.  (Tr. 36).
He has given up his hobbies like golfing and fishing.  (Tr. 36).


Testimony of Dr. McKenna

        Dr. James McKenna testified at the August 2011 hearing as a
medical expert.  (Tr. 73-92).  Dr. McKenna testified that Lugo had a
left   rotator   cuff   injury   and   productive   changes   of   the
acromioclavicular joint which he stated was spurring of that joint.
(Tr. 75-76).  There was also an associated impingement syndrome.  (Tr.
76).  Conservative repair surgery was performed on June 18, 2009, but
they did not do the "Mumford decompression" or radical acromioplasty
that Dr. McKenna indicated would have been appropriate.  (Tr. 76).
The surgeon found that his biceps tendon was also torn and that was
treated surgically.  (*Id.*).  Dr. McKenna noted that the left shoulder
MRI from October 2009, showed that he did not have a healed, intact
supraspinatus tendon and there was some residual signal abnormality

showing that there was not complete healing. (Tr. 77). There was also "severe tendonosis of the infraspinatus tendon with a small partial tear and thickness and the articular surface suprascapular tear." (Tr. 77). Dr. McKenna explained that Lugo also has premature osteoarthritis in the left wrist. (Tr. 78). Dr. McKenna also noted that Lugo was found to have bilateral cubital tunnel syndrome, but with all of the symptoms on the left. (Tr. 79). Dr. McKenna stated that the ulnar nerve supplies the small finger and the lateral half of the ring finger and it mostly affects motor function of abduction of the small finger. (Tr. 79). Dr. McKenna opined that Lugo's ulnar neuropathy would really only affect a concert pianist trying to get a full span of the keyboard. (Tr. 79-80). Dr. McKenna noted that there could be more limitation where pain was involved. (Tr. 80). Dr. McKenna noted some residual pain in Lugo's shoulder, then stated:

> We would have some residual loss of function as a result of his previous conditions of the tear plus repair, and then we have the, we have some arthritis in his wrist, which he is somewhat partially symptomatic from, even though some of the pain in the wrist may be radiation from the elbow pain because of the carpal tunnel as well.

(Tr. 81). Dr. McKenna repeated that Lugo could have referred pain into his left wrist. (Tr. 81). Dr. McKenna testified that Lugo did not quite meet Appendix 1 Listing 1.08, but then noted that "pain does interfere with his function somewhat." (Tr. 81-82). Dr. McKenna said that the listing differentiated between normal function and major function and opined that the listing was not equaled despite the pain.

(Tr. 82).

Dr. McKenna testified that he thought a limitation to a light load was prudent. (Tr. 83). Dr. McKenna supported occasional crawling. (Tr. 83). He felt that Lugo's reaching on the left would be limited to occasional. (Tr. 83-84). But, Dr. McKenna later added that he would reduce handling on the left side to only 10-15% of the work-day, referring to gross manipulation with the left hand. (Tr. 84). Dr. McKenna also noted that Lugo should avoid concentrated exposure to extreme cold as well as vibration. (Tr. 85). Dr. McKenna said that he did not think the ulnar neuropathy would affect someone who had to type on the job unless they were speed typing and that frequent computer use would be okay. (Tr. 85-86). Dr. McKenna then added that elbow flexion would be difficult for Lugo. (Tr. 86). In response to further questioning, Dr. McKenna acknowledged that typing/using the computer in general results in flexed elbows. (Tr. 86-87). Dr. McKenna amended his opinion to reflect that Lugo's computer usage should be limited to occasional instead of frequent. (Tr. 87). Dr. McKenna then brought up the possibility of a functional overlay and noted that there had been a suggestion by a treating source that Lugo see a psychiatrist. (Tr. 88). Dr. McKenna, however, admitted that none of the treating physicians had suggested a functional overlay and the psychiatric referral was for reactive depression. (Tr. 88). Despite Dr. McKenna's initial concern about the EMG results, he ended up stating that it was actually difficult

to say what the initial EMG changes represented. (Tr. 89).
Nonetheless, Dr. McKenna noted that he found it "a little troubling
that [there are] symmetrical objective findings and asymmetrical
subjective findings." (Tr. 89). Dr. McKenna expressed concern
regarding Lugo's credibility based on a comparison of the complaints
to the medical record, but stated that he was considering Lugo's pain
"to a certain extent" in reaching his conclusion regarding Lugo's RFC,
but other than stating he was not considering 100% of Lugo's pain, he
did not explain how much pain he had included. (Tr. 89-90).


Testimony of Dr. Brooks

Psychologist James Brooks testified via telephone as a medical
expert at the supplemental hearing held on January 3, 2012. (Tr. 36-
43). Dr. Brooks had not been present at the first hearing and he
asked no questions of Lugo prior to offering his opinion. (Tr. 36).
Dr. Brooks' testimony focused on four exhibits in the file: notes from
Dr. Roger Parks who saw Lugo for 13 individual therapy sessions in
2008 (Exhibit 9F); the June 2010 report of Dr. Walters (Exhibit 10F);
and both a report and an assessment from Dr. Amdur in August of 2011
(Exhibits 17F, 20F). (Tr. 37-39, 422-25, 426-29, 532-36, 543-54).
Dr. Brooks stated that back in 2008, Lugo was diagnosed with an
adjustment disorder with some symptoms of depression related to

marital problems.[9] (Tr. 37). He testified that at the time of the June 2010 psychological evaluation, Lugo was receiving no mental health treatment and no diagnosis was made on either Axis I or Axis II. (Tr. 37). He stated that the assessment supported only a very mild level of any kind of psychiatric symptoms. (Tr. 37). Dr. Brooks testified that the psychological evaluation from August 2011 showed a totally different picture: it described Lugo as having severe depression symptoms, decreased libido, weight gain, excessive sleep, somatic pain and preoccupation, and social withdrawal. (Tr. 37-38). In August of 2011, Lugo was given a diagnosis of major depression. (Tr. 37-38). Dr. Brooks stated that although Lugo related his worsening depressive symptoms back to January 2010, the report from June 2010 did not demonstrate diagnosable depression. (Tr. 38).

Dr. Brooks also expressed concern about the manner in which the 2011 evaluation took place: the examining psychologist administered the evaluation at the office of Lugo's attorney. (Tr. 38-39). The psychologist, Dr. Amdur, works for the Thresholds organization and does not have a separate office. (Tr. 40-41). He usually goes to

---

[9]On July 25, 2007, Lugo asked his primary care physician to refer him to a psychiatrist. (Tr. 414). From February 19, 2008 through July 7, 2008, Lugo had 13 therapy sessions with psychologist Roger L. Parks, Psy.D. (Tr. 425). He presented with depressive symptoms including low level energy, difficulty concentrating and poor sleep. (*Id.*). He was diagnosed as having an adjustment disorder with depressed mood. (Tr. 425). The depression was related to marital conflict, and only minimal progress had been made when therapy ended and Lugo indicated that he might be interested in marital therapy with his wife. (*Id.*).

individual's homes for psychological evaluations, but since Lugo lives in Indiana and Dr. Amdur is licensed in Illinois, the evaluation was performed at the attorney's office in Illinois. (Tr. 40-41). Dr. Brooks testified to no severe mental impairment based primarily on the June 2010 report. (Tr. 39-40).

Dr. Brooks acknowledged that long periods of severe pain can affect an individual's mental status. (Tr. 41). Dr. Brooks also conceded that it was possible that an individual's mental status could have deteriorated over a year when the person had been experiencing significant pain. (Tr. 41). Dr. Brooks acknowledges that several medical examination reports noted that Lugo reported pain. (Tr. 41). Dr. Brooks also admitted that difficulty sleeping at night can affect someone's mental status. (Tr. 42). Dr. Brooks also testified that Lugo's current testimony is more consistent with the August 2011 report than the June 2010 report. (Tr. 42). Dr. Brooks acknowledged that since he was testifying by telephone he was unable to observe Lugo. (Tr. 42-43). Dr. Brooks stated that crediting Dr. Amdur's report, Lugo would meet the requirements of Listing 12.04 sometime after June 2010. (Tr. 43).


Testimony of VE Leonard Fisher

Leonard Fisher testified as a VE at Lugo's first hearing. (Tr. 90-99). In response to a "modified" RFC consistent with Dr. McKenna's testimony, VE Fisher testified that such an individual would be unable

to perform Lugo's past relevant work or use any transferable work skills. (Tr. 91-92). The VE stated that the hypothetical individual would be at the light unskilled level. (*Id.*). The VE named parking lot attendant,[10] school bus monitor and usher as jobs the hypothetical person could perform. (Tr. 93). The VE said that in his experience, parking lot attendants use their dominant hands from occasionally to frequently. (Tr. 98). If the individual must lie down for two hours during the day, the individual would be unable to sustain gainful employment. (Tr. 97).


Testimony of VE Thomas A. Gusloff

Thomas A. Gusloff testified as a VE at Lugo's second hearing. (Tr. 43-49). When presented with a hypothetical question limiting the individual according to Dr. McKenna's testimony, VE Gusloff testified that such an individual would be unable to perform Lugo's past relevant work as a sheet metal worker. (Tr. 44-45). The VE named three light unskilled jobs he considered consistent with the hypothetical, naming usher, counter clerk and investigator-dealer accounts. (Tr. 45). When limitations of function from Dr. Amdur's assessment were added to the hypothetical, VE Gusloff testified that there would be no jobs. (Tr. 45-46). The VE also explained that the delineation of reaching, handling, fingering and feeling between the

---

[10]The VE testified that the job of parking lot attendant is no longer consistent with the definition listed in the DOT but that, based on his experience, he considers the job to be consistent with the parameters of the ALJ's hypothetical question. (Tr. 94-95).

left and right arms is not specifically addressed by the Selected Characteristics of Jobs Defined in the Dictionary of Occupational Titles. (Tr. 46).

Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.* Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety, but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347, F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB under the Social Security Act, the claimant must establish that he is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1: Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to Step 2.

Step 2: Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to Step 3.

Step 3: Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404, Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to Step 4.

Step 4: Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to Step 5, where the burden of proof shifts to the Commissioner.

Step 5: Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); *see also Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case the ALJ found that Lugo was not engaged in substantial gainful activity and that he suffered from severe impairments; namely, essential hypertension, status-post left shoulder rotator cuff surgery with detached bicep surgery on the left arm, and

-25-

left cubital tunnel syndrome. The ALJ further found that Lugo did not meet or medically equal one of the listed impairments and could not perform any of his past relevant work, but nonetheless retained the physical residual functional capacity to perform a reduced range of light work. More specifically, the ALJ found that:

> The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(a) in that the claimant can occasionally lift and/or carry up to 20 pounds and frequently lift and/or carry up to 10 pounds. He can stand and/or walk 6 hours in an 8-hour workday. The claimant should never climb ladders, ropes, or scaffolds and can only occasionally crawl. He can finger and feel constantly with both hands, but must limit reaching with the left, dominant hand to 10% to 15% of an 8-hour workday. He can reach constantly with the right hand, and handle constantly with the right hand, but can only occasionally handle with the left hand and must never do any overhead reaching with the left upper extremity. He should also avoid concentrated exposure to extreme cold.

(Tr. 16).

With these limits in mind, the ALJ found that Lugo could not perform his past relevant work, but that there were jobs existing in significant numbers in the national economy that Lugo could perform. (Tr. 22-23). Thus, Lugo's claim failed at step five of the evaluation process. Lugo believes that reversal is required because the ALJ's decision was not supported by substantial evidence.

Lugo believes that the ALJ erred by failing to give proper consideration to:

(1) evidence from one of Lugo's treating physicians;
(2) Lugo's credibility; and

(3) Lugo's mental impairment.

Each argument will be examined in turn.


## The ALJ's Consideration of Evidence from Dr. Thometz

Lugo claims the ALJ erred in evaluating the evidence obtained from one of his treating physicians, Dr. Thometz. Social Security Ruling ("SSR") 96-2p provides that a treating physician's medical opinion must be given controlling weight if it is "well supported" and "not inconsistent with other substantial evidence in the case record." Furthermore, SSR 96-2p requires that the ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p.

If the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the ALJ must apply the following factors to determine the proper weight to give the opinion:

> (1) the length of the treatment relationship and frequency of examination;
>
> (2) the nature and extent of the treatment relationship;
>
> (3) how much supporting evidence is provided;
>
> (4) the consistency between the opinion and the record as a whole;
>
> (5) whether the treating physician is a specialist;

(6) any other factors brought to the attention of the
                    Commissioner.

20 C.F.R. §§ 404.1527(d)(2) and 416.927(a)-(d); *see Moss v. Astrue*, 555

F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th

Cir. 2008).  It is reversible error for an ALJ to discount the medical

opinion of a treating physician without applying this legal standard and

for further failing to support the decision with substantial evidence.

*Moss*, 555 F.3d at 561; *see also Punzio v. Astrue*, 630 F.3d 704, 710 (7th

Cir. 2011) (finding the ALJ's rejection of a treating physician's mental

residual functional capacity questionnaire was not substantially

supported).

       Lugo began treating with Dr. Thometz, an orthopaedic surgeon,

shortly after his work related injury.  Several months after the

injury, Dr. Thometz reported that Lugo was not "capable of work" and

needed to continue therapy.  (Tr. 331).  Dr. Thometz' notes repeat a

variation of his opinion that Lugo could not work on several

instances.  In December of 2009, Dr. Thometz noted that Lugo was not

yet ready for work conditioning.  (Tr. 380).  In March of 2010, Dr.

Thometz noted that Lugo was "not capable of regular work." (Tr. 378).

Again, in April of 2010, Dr. Thometz noted that Lugo was "not capable

of regular work at that time." (Tr. 376, 472).  These treatment

notes, although opining on Lugo's ability to work, did not offer

specific limitations regarding Lugo's ability to function.

       In September of 2011, Dr. Thometz completed a medical source

                                    -28-

statement of ability to do physical work-related activities. (Tr. 555-60). This form provided detailed opinions regarding what Lugo can and cannot do. More specifically, Dr. Thometz opined that Lugo should not lift or carry even as little as ten pounds. Furthermore, Lugo should avoid prolonged sitting, standing or walking and should not use his hands or wrists. (Tr. 556). According to Dr. Thometz, Lugo should never use his left hand and his right hand should only be used occasionally for feeling and fingering. (Tr. 557). And, Dr. Thometz concluded that Lugo should never climb ladders, ropes, or scaffolds; stoop, kneel, crouch or crawl; and should only occasionally balance. (Tr. 558).

The ALJ did not give Dr. Thometz' opinion controlling weight. According to the ALJ:

> Dr. Thometz indicated throughout his 2009 and into 2010 records that the claimant would not be capable of regular work. The undersigned notes that these opinions were rendered mostly after the claimant had undergone his rotator cuff surgery and was still participating in physical therapy. Additionally, Dr. Thometz's notes consistently document the claimant's positive improvement with the help of the therapy and at-home exercises. His indications that the claimant would not be capable of regular work are not necessarily clear as to what he considers to be regular. His opinions are given moderate weight, but based on his treatment notes from this period and the claimant's progression after his corrective surgery, he would still be capable of performing work within the parameters set forth in the residual functional capacity above (Exhibit 5F).

> Dr. Thometz completed a Physical Impairment Questionnaire on Residual Functional Capacity

dated August 28, 2011. Therein, he indicated that because of the claimant's surgical history, complaints of shoulder discomfort, and recent diagnosis of bilateral cubital tunnel syndrome, his prognosis was fair to poor and that the claimant would not be capable of working. He indicated that the claimant could only lift 5 to 10 pounds with his dominant left hand and that he could carry only 5 to 10 pounds with his left hand, but that any repetitive motion of the left hand would aggravate the pain. The undersigned gives little weight to Dr. Thometz's opinion that the claimant cannot work as he provided restrictions that would not totally preclude the claimant from all work. In fact, a few months prior to this opinion, Dr. Thomet'z [sic] indicated in his notes that the claimant could not return to his regular work, not that he could not do any work at all, especially since he continues to indicate no change in the claimant's condition from this indication all the way through to his opinion rendered in August 2011. His opinion as to the claimant's weight lifting restrictions is given moderate weight. The records indicate difficulty with numbness in the pinky and ring finger of the left hand and shoulder discomfort. These complaints do not necessarily support the claimant's inability to lift anything with either hand. In any event, the claimant's limitations have been reasonably accounted for in the residual functional capacity above, and based on vocational expert testimony, he is not totally precluded from all work within the national economy, and is therefore not disabled (Exhibit 18F).

On September 21, 2011, Dr. Thometz then completed a Physical Medical Source Statement indicating that the claimant could not lift even up to 10 pounds with a number of other severe restrictions including an inability to sit more than 10 minutes at a time, even though the records do not ever make mention of the claimant's difficulty sitting, standing, or walking. Little weight is also given to Dr. Thometz's opinion contained in his Medical Source Statement as they are generally inconsistent with the objective record and lack supporting evidence, including support

from his own treatment notes (Exhibit 21F).

(Tr. 21-22).

According to Lugo's counsel:

> Dr. Thometz has consistently reported that Lugo
> required additional treatment and therapy before
> he would even be ready for work hardening
> /conditioning, let along [sic] be ready for
> competitive employment. Unfortunately, because
> of the recalcitrant behavior of the worker's
> compensation insurer, Lugo has been unable to
> obtain the treatment and therapy that he has
> required since January 2010. As a result, he was
> still having problems from the shoulder itself as
> well as from the post-surgical developments in
> his left wrist and elbow.

(DE 11 at 20). Contrary to counsel's suggestion, Dr. Thometz' notes appear to mention that Lugo was not ready for work conditioning only once. (Tr. 380). And, it is not clear whether Dr. Thometz was referring to work conditioning that is specific to Lugo's previous work as a sheetmetal worker or work conditioning for the purpose of being able to perform any work whatsoever. This case involved a worker's compensation claim, and when Dr. Thometz refers to "regular work" it is not clear if he is referring to Lugo's regular work as a sheetmetal worker or work generally as regularly performed. Ultimately, this is irrelevant though, because Dr. Thometz' opinions on the ultimate issue of whether Lugo can work are not entitled to special deference. The determination of whether Lugo is disabled as defined under the Social Security Act is not one for Dr. Thometz to make; it is a determination reserved to the Commissioner. While the ALJ *must* consider medical evidence of Lugo's impairments, the

final responsibility for deciding Lugo's RFC is reserved to the Commissioner, and a treating physician's opinion that the claimant is "disabled" or "unable to work" will not be given any special significance. *See Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012).

The only portion of Dr. Thometz' opinions that included specific enough limitations regarding Lugo's function so they might be entitled to controlling weight, if well supported and consistent with other substantial evidence, are the opinions in the Physical Impairment Questionnaire dated August 29, 2011, and the Medical Course Statement dated September 21, 2011. (Tr. 537-40; 555-60). The ALJ noted with specificity what weight he gave to the opinions in these reports. With regard to the Physical Impairment Questionnaire, he gave little weight to the opinion that Lugo could not work because the restrictions given were not inconsistent with all work, and he gave moderate weight to Dr. Thometz' lifting restrictions.[11] (Tr. 21-22). With regard to the Physical Medical Source Statement, the ALJ gave little weight to Dr. Thometz' opinion in that statement because "they

---

[11]Lugo quibbles with the ALJ's statement that he gave moderate weight to certain opinions of Dr. Thometz, suggesting that it is not clear what that means. But when the ALJ's opinion is read as a whole, rather than just reading the excerpt that Lugo quotes in his brief, it is clear what the ALJ meant. (Tr. 21-22). As noted above, the ALJ gave moderate weight to Dr. Thometz' lifting restrictions, which were 5 to 10 pounds, and the ALJ ultimately found in his RFC that Lugo could lift only slightly more than that, finding he can lift and carry 10 pounds frequently and 20 pounds occasionally. (Tr. 538, 16).

are generally inconsistent with the objective record and lack supporting evidence, including support from his own treatment notes." (Tr. 21-22).

Lugo also notes that the ALJ gives the most weight to Dr. McKenna's testimony. Lugo argues that Dr. McKenna formed his opinion without reviewing the evidence submitted after the first hearing, and that, as a non-examining physician, his opinion therefore cannot be given controlling weight. Contrary to Lugo's suggestion, nothing in the ALJ's opinion suggests that he gave Dr. McKenna's opinion controlling weight in violation of the treating physician rule - he simply gave it more weight than other opinions of record. ALJ Kramer did not error either in limiting the weight given to Dr. Thometz' opinions or by placing too much weight on Dr. McKenna's opinion.


The ALJ's Credibility Assessment

Lugo argues that the ALJ improperly discredited his testimony in violation of SSR 96-7p by relying on meaningless boilerplate language without providing adequate explanation. Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v.*

*Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

Further, "the ALJ cannot reject a claimant's testimony about limitations on [his] daily activities solely by stating that such testimony is unsupported by the medical evidence." *Id*. Instead, the ALJ must make a credibility determination that is supported by record evidence and sufficiently specific to make clear to the claimant, and to any subsequent reviewers, the weight given to the claimant's statements and the reasons for the weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security application, an ALJ must comply with the requirements of SSR 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002). This ruling requires ALJs to articulate "specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p.

Here, ALJ Kramer determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 20). Nearly identical language

was criticized by the Seventh Circuit in *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). That criticism will not be repeated here. The boilerplate language utilized by ALJ Kramer is unhelpful at best, and by itself, such language is inadequate to support a credibility finding. *See Richison v. Astrue*, No. 11-2274, 2012 WL 377674 (7th Cir. 2012).

However, where boilerplate language such as that utilized by the ALJ is accompanied by additional reasons, a credibility determination need not necessarily be disturbed if otherwise adequate. *Id.* In this case, the ALJ's opinion contains more than mere boilerplate language in support of his credibility determination. Specifically, the ALJ's opinion includes the following:

> When evaluating the claimant's credibility as it relates to his assertions, the undersigned takes into consideration various factors, including the objective medical evidence, statements relating to alleged pain, medical treatment, medications taken, and any opinion evidence (*see* Social Security Ruling 96-7p).
>
> Overall the claimant's allegations were generally credible. However, there were some discrepancies that detracted from his credibility as well. For example, the claimant's mental status examination as mentioned above limits him greatly, almost to the point of an inability to function on his own. However, the claimant has shown such abilities. Additionally, though he was diagnosed with bilateral cubital tunnel syndrome, he only alleged symptomatology in one of his hands. Though this is not completely unusual, it is out of character and calls into question the validity of the claimant's subjective complaints as pain is not a symptom that can be measured or quantified.

(Tr. 20-21).

The issue this Court must decide is whether the ALJ's stated reasons are sufficient. In other words, is there a logical bridge between the ALJ's stated reasons and the conclusion that Lugo is not fully credible? Lugo claims the ALJ's stated reasons for finding him less than fully credible are inadequate because the ALJ has claimed discrepancies exist where they do not.

First, the ALJ noted that Lugo's abilities were greater than those set forth in the mental status examination. ALJ Kramer is referencing the mental status exam performed by Dr. Amdur in August of 2011. Lugo notes that: "The ALJ makes that statement without acknowledging, as did Dr. Brooks, that Plaintiff's testimony was most consistent with the latest mental status examination [meaning Dr. Amdur's report from August of 2011] and also the fact that pain and a sleep disorder can cause mental decompensation." (DE 11 at 23). Substantial evidence of record supports the ALJ's conclusion that Lugo's demonstrated abilities were inconsistent with the mental status exam performed by Dr. Amdur in August of 2011. While it is possible that Lugo's condition changed significantly between Dr. Walters' report in June of 2010 and Dr. Amdur's report in August of 2011, the evidence is not so strong that the ALJ was precluded from relying on this discrepancy in reaching his decision regarding Lugo's credibility. That Dr. Brooks conceded pain and sleep disorder can cause mental decompensation does not demonstrate that is what happened

here.  This Court might have reached a different conclusion, but that is not grounds for overturning the ALJ's decision.  *See Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989).

Next, Lugo takes issue with the ALJ's opinion  that Lugo's having only left-sided symptoms despite his diagnosis of bilateral cubital tunnel syndrome reflects negatively on his credibility.  According to Lugo: "[t]he ALJ makes a giant leap to speculatively assert that in this case, having only left-sided symptoms in light of a diagnosis of bilateral cubital tunnel, is out of character and a basis to question the validity of Plaintiff's subjective complaints."  (DE 11 at 23).  A review of the record shows that this leap finds at least some support in the evidence.  Dr. McKenna, a medical expert, testified at length and explained that he found "it a little troubling that we have symmetrical objective findings and asymmetrical subjective findings." (Tr. 89).  In formulating an RFC, Dr. McKenna indicated that he was taking Lugo's complaints of pain into account "to a certain extent, but not .... at absolute 100 percent, full face value, on account of the discrepancy."  (Tr. 90).  The ALJ did not make reference to Dr. McKenna's testimony in making his credibility determination.  His opinion would have been stronger if he had, but in light of the medical evidence, it cannot be said that the ALJ's logic is speculative or the "giant leap" that counsel describes.  In light of the evidence of record, this Court cannot say that ALJ Kramer's reliance on the discrepancy between the medical evidence of bilateral

cubital tunnel syndrome while symptoms were only unilateral was erroneous. *See Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005)("An ALJ may not disregard an applicant's subjective complaints of pain simply because they are not fully supported by objective medical evidence ...[b]ut a discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration.").

The ALJ could have done a better job of annunciating his reasoning, but because substantial evidence of record supports the ALJ's determination, this Court finds that the ALJ's credibility determination is not patently wrong.

The ALJ's Consideration of Lugo's Mental Impairment

Lugo argues that the ALJ's assessment of his depression was erroneous and requires remand. The ALJ found that Lugo does suffer from depression, but that it is non-severe. (Tr. 14-15). In so finding, he chose to give little weight to the report of Dr. Amdur, who concluded that Lugo was suffering from major depression so severe that he would be unable to relate effectively with co-workers and supervisors and unable to tolerate work stressors. (Tr. 14, 532-36). In essence, Lugo's argument that the ALJ did not properly assess his mental impairments amounts to a challenge to the ALJ's rejection of Dr. Amdur's opinion.

In determining that Lugo's depression was not severe, ALJ Kramer

considered several factors. He noted that Lugo did not initially allege any mental impairment when he applied for DIB. (Tr. 14). He also noted Lugo's history of psychological treatment, or lack thereof. (*Id.*). More specifically, the ALJ noted that Lugo sought therapy from February through July of 2008 and was diagnosed with an adjustment disorder with depressed mood. (*Id.*). The ALJ considered a psychological consultative evaluation performed by Irene Walters, Psy.D on June 29, 2010. (*Id.*). Dr. Walters did not diagnose Lugo with *any* mental impairment and assigned him a Global Assessment of Functioning ("GAF") score of 65.[12] Two months after Dr. Walters' examination, on August 11, 2010, Dr. Thometz noted that Lugo had been feeling anxious and depressed and recommended a psychological consultation. (Tr. 455, 466).

In August of 2011, Lugo saw Dr. Amdur for a psychiatric evaluation. (*Id.*). The ALJ noted that Dr. Amdur's report indicated that Lugo had been experiencing depression for six months, and that he reported no depression prior to his 2009 injury. The ALJ noted that Dr. Amdur formulated his opinion after only a one-time visit and that Lugo had not sought any other mental health treatment for his depressive symptoms. (Tr. 14). The ALJ noted that Dr. Amdur found that Lugo suffered from numerous extreme and marked limitations, but

---

[12]GAF is a scoring system for measuring an individual's overall functional capacity. A GAF of 65 would represent mild symptoms or some impairment in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR,* 32-34 (4th ed. 2000).

that there were no medical records that supported such severe limitations. (Tr. 14-15). Specifically, the ALJ noted that:

> As there are no records to support such severe limitations and these opinions are based on a one-time visit with the claimant, Dr. Amdur's opinions are given little weight. They are inconsistent with the objective record and are based primarily on the claimant's subjective allegations. However, giving the claimant the significant benefit of the doubt, the undersigned finds that he does suffer from depression, but not to the degree indicated by Dr. Amdur (Exhibit 20F).

(Tr. 15). The ALJ further noted that, "the claimant's medically determinable mental impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities[.]" (Tr. 15).

Lugo's counsel correctly points out that Dr. Amdur's opinion should not be rejected solely because he is a one-time examiner. After all, Dr. Walters also only examined Lugo once but her opinion was not rejected by the ALJ. But, the length of treatment is one valid consideration in determining what weight to give to a medical opinion. In determining that Dr. Amdur's opinion was entitled to little weight, it was proper for ALJ Kramer's to consider that Lugo saw Dr. Amdur only once, along with other factors. Because ALJ Kramer did not base his decision on the weight to be given Dr. Amdur's opinion on the nature of their treatment relationship alone, his consideration of that factor was not error.

Lugo's counsel points out that Dr. Brooks, whose testimony the

ALJ credited, admitted that an individual who is in pain and not sleeping can experience mental decompensation. (Tr. 41-42). Dr. Brooks did concede this, but the fact that this can occur does not mean that it did occur here. Dr. Brooks did not opine that Lugo's condition had deteriorated due to pain and lack of sleep; he only conceded that pain and lack of sleep can cause deterioration.

Lugo's counsel also points out that Dr. Amdur's report was very detailed, and that it is consistent with Dr. Thometz' notes from August 11, 2010, noting that Lugo was anxious and depressed and recommending a psychological evaluation. (Tr. 455, 466). An ALJ need not accept a report merely because it is detailed. And, as for Dr. Thometz' report that Lugo was anxious and depressed, this is not necessarily inconsistent with the ALJ's finding - the ALJ conceded that Lugo suffered depression, albeit non-severe. There is a logical bridge between the evidence and the ALJ's decision to give Dr. Amdur's report little weight. While a different ALJ may have viewed the evidence differently, this Court cannot say that ALJ Kramer committed reversible error in evaluating Lugo's mental impairments.


CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **AFFIRMED**.

DATED: July 23, 2014          /s/RUDY LOZANO, Judge
                              **United States District Court**